GNAU ET UX. *v.* KINLEIN ET AL.

[No. 230, September Term, 1957.]

*Decided May 20, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*J. Elmer Weisheit, Jr.,* for appellants.

*Nelson R. Kerr,* for appellees.

HAMMOND, J., delivered the opinion of the Court.

Arthur Gnau and Estelle Gnau, his wife, the common grantors of lots in a development in Baltimore County restricted to residential use, appeal from an injunction issued at the instance of owners of houses in the development against using for commercial purposes the lots they still own.

In 1946 the Gnaus bought an unimproved tract of land of some eight acres, with a frontage of about nine hundred feet on the east side of Loch Raven Boulevard south of Taylor Avenue. In April 1947, one Medtart arranged with the Gnaus to buy a one hundred-foot building lot in the tract. Medtart's lawyer, Rudolph J. Machovec, was employed by the Gnaus to prepare a deed of the land from them to him as straw man and a deed back to them. The deed to the straw man recited that the grantors had caused the tract to be subdivided into lots as shown on a plat filed with and expressly made a part of the deed, and continued:

"WHEREAS the Grantors are desirous of subjecting all of said tract of land and the lots shown on said plat to certain covenants agreements restrictions conditions and charges as hereinafter set out and

WHEREAS in order to make said covenants agreements restrictions conditions and charges binding and of full force and effect on all the land included in said tract and the lots shown on said plat and upon the present and future owners and occupants of the same their and each of their heirs executors administrators successors and assigns the Grantors and Grantee have agreed to enter into this Deed and Agreement whereby the Grantors will convey to the Grantee all the lots shown on said Plat and immediately thereafter the Grantee will reconvey to the Grantors charged with all the covenants

agreements restrictions conditions and charges hereinafter set out all the said lots."

The grant of the thirteen lots shown on the plat, entitled "Loch Knoll Manor", was made "subject to the covenants agreements restrictions conditions and charges hereinafter set out", and the habendum clause said that the lots were to be held by the Grantee his heirs and assigns "subject however to the following covenants agreements restrictions conditions and charges which it is hereby covenanted and agreed shall be binding upon the Grantors their heirs and assigns and upon the Grantee his heirs personal representatives and assigns and upon all the land included in said tract * * *." There followed ten restrictions as to the lots including those as to the uses of the lots, setback distances, the minimum cost of houses, side yard widths, the percentage of the lot to be covered, and the restriction with which the present appeal is particularly concerned, that "the land included in said tract shall be used for private residence purposes only and no building of any kind whatsoever shall be erected or maintained thereon other than a brick or stone dwelling house", except that a second floor might be of clapboard construction. Then came the following covenant: "And it is further covenanted and agreed by and between the parties hereto that no sale lease mortgage disposition or transfer thereof shall be made or operate otherwise than subject to the aforesaid covenants agreements restrictions conditions and charges as to and upon the use and occupancy that neither the said parties nor either of them their or either of their heirs personal representatives successors or assigns will do or suffer or permit to be done any of the matters or things above mentioned excepting only as aforesaid and that all the covenants agreements restrictions conditions and charges herein contained shall run with and bind the land and each and all of the above mentioned lots and premises and every part thereof and the heirs personal representatives successors or assigns of each and all of the parties hereto and shall be kept and performed by and inure to the benefit of and be enforceable by all and every person and persons and bodies politic or corporate at any time owning or occupying said

land property premises or interest or estates of any of them but no owners or occupants shall be responsible except for his her or its acts or defaults while owner or occupants."

The deed from the straw man to the Gnaus reconveyed the thirteen lots as shown on the plat of Loch Knoll Manor and its habendum clause subjected the property conveyed to "the covenants agreements restrictions conditions and charges" in the deed from the Gnaus to the straw man. The deeds were executed on April 30, 1947, the plat was prepared, and on June 17, 1947, the deeds and the plat were duly recorded among the Land Records of Baltimore County. Four days later the Gnaus conveyed lot 9 as shown on the plat to Medtart and wife. This deed neither included nor made reference to any restrictive covenants. In 1954 the Gnaus repurchased lot 9, taking a deed in which there was no mention of such covenants. In 1949 lots 1 and 2 were deeded by the Gnaus to purchasers and the deed contained no covenants nor reference to the covenants. Several weeks later, lots 7 and 8 were conveyed by a deed which provided that the lots were to be held "subject to the restrictive covenants" set forth in the deed from the Gnaus to Machovec. Lots 5 and 6 were conveyed in 1950 by a deed which did not refer to the covenants, and the purchaser three years later by a similar deed transferred the property to its present owners. Later in 1950, lots 3 and 4 were conveyed and the habendum clause of the deed contained the same language as that in the deed to lots 7 and 8, namely, that they were to be held "subject to the restrictive covenants" set forth in the Gnau-Machovec deed.

In 1956 the Gnaus applied to the Zoning Commissioner of Baltimore County for reclassification of lots 9 to 13 in Loch Knoll Manor from "A" Residential to "E" Commercial, and procured a permit for, and erected, a sign proclaiming that a professional building would be built on the lot. Thereupon the owners of lots 1 and 2, the immediate grantees of the Gnaus, the owners of lots 3 and 4, likewise immediate grantees of the Gnaus, and the owners of lots 5 and 6, who took title from an immediate grantee, filed a bill of complaint to enjoin the Gnaus from proceeding directly or indirectly in violation of their express covenants, restrictions and agree-

ments relating to their property known as lots 9 to 13, inclusive, of Loch Knoll Manor. After hearing, the chancellor granted the injunction prayed.

The Gnaus base their right to reversal on three claims: (1) that the restriction to residential use does not bind lots 9 to 13, the portion of the original tract now owned by them; (2) that if the restriction once was binding on these lots it has been waived by each of the appellees; and finally (3) that the character of the neighborhood has so changed that the restriction can no longer serve any useful purpose and therefore enforcement would be oppressive and unreasonable to the appellants and without benefit to the appellees or their properties.

As to the first point, the Gnaus claim that when Machovec reconveyed the thirteen lots to them in 1947 no one else had any interest in the land, and they could transfer it subject to restrictions or without restrictions, as they chose; that in none of the deeds from them to purchasers of lots did they covenant or agree that the land retained by them would be subject to any restrictions; and that there was no general and uniform plan of development which would entitle lot holders to enforce a covenant against them. We can find no legal substance or weight in any of these claims. Whether a restrictive covenant is personal to a grantee or a grantor, or to both, or binds their respective successors in title, and so the land by whomever owned from time to time, as well as whether a grantor intended to bind land retained by him, is a question of intention, which may be ascertained from the language of the conveyances alone or from that language together with other evidence of intent. *Schlicht v. Wengert,* 178 Md. 629; *Club Manor v. Oheb Shalom Cong.,* 211 Md. 465, 475-476; *Halle v. Newbold,* 69 Md. 265; *Turner v. Brocato,* 206 Md. 336; *Oak Lane Corporation v. Duke,* 196 Md. 136.

In the case before us the purpose and intent of the Gnaus to subject all of the lots in the development to all of the restrictions, whether retained by them or sold, for the common benefit of the owners of the lots from time to time, is as plainly expressed as would seem possible. The language used

by them in their deed to Machovec leaves no doubt in our minds that the restrictions were to be as binding upon the land retained by them as upon any other of the land. The very purpose of the conveyance to the straw man and the reconveyance was to bind all of the land by all of the restrictions, so as to start the sale of lots in the development by the deed to Medtart, and after the delivery of that deed the Gnaus no longer had power unilaterally to remove the restrictions they had created, or to avoid their full impact on lots retained or to be regained by them. Whether or not that deed or subsequent deeds contained reference to the restrictions, those who took, if they did not have actual notice as did Medtart, were put on constructive notice by the record title that the land they acquired would be bound by the restrictions. In *Lowes v. Carter,* 124 Md. 678, 680, 683, 685-686, the developer imposed restrictions on the lot sold and covenanted that each lot now owned by him on a designated plat would be subject to similar restrictions "* * * whether the said lots be sold or retained by the said party of the first part * * *." The grantor later mortgaged lots he had not sold without reference to restrictions; the mortgage was foreclosed and title conveyed to a purchaser who proposed to violate the restrictive covenants expressly in effect on the lots that had been sold before the execution of the mortgage. The Court found: "* * * a clear indication of a purpose to impose upon the lots, and their present and future owners, the restrictions which the covenant prescribed for their common benefit", and speaking of the inclusion of the restrictive covenant in the deeds and their recording, said: "The method adopted was practical and appropriate and was authorized by the law as a means of safeguarding the rights created by the deed against adverse interests of later origin", and concluded that the buyer at the mortgage foreclosure was "chargeable with implied notice" that the property was subject to the restrictions.

In *Ford v. Union Trust Co. of Md.,* 196 Md. 112, a deed from a common grantor contained restrictions that the premises could be used for residential purposes only and a provision that the restrictions should bind all the property of

both the grantors and the grantees, and all the land within the outlines of the plat with reference to which the lots were conveyed, and should run with and bind the land within these outlines and should be included in, or construed to be included in, all future deeds or conveyances of any part of the property. The Court said: "This is the simplest method of creating enforcible restrictions running with the land. *Levy v. Dundalk Co.,* 177 Md. 636, 647, 11 A. 2d 476; *Scholtes v. McColgan,* 184 Md. 480, 489, 41 A. 2d 479." In *Middleton Realty v. Roland Park,* 197 Md. 87, where it was covenanted that the restrictions should run with the land and bind the lot conveyed and must be observed and kept by each and all of the persons owning and occupying same, it was held the covenant was not personal and that it permitted an assignee of a grantee to enforce the restrictions, although assignees were not expressly mentioned. See also *Kirkley v. Seipelt,* 212 Md. 127, 131; and *Turner v. Brocato, supra;* compare *Wood v. Stehrer,* 119 Md. 143. The language used in the Gnau-Machovec deed states expressly that the restrictions were to be binding upon the Gnaus and their grantees, and the heirs and assigns of both, and "upon all of the land included in said tract"; and that no transfer is to be other than subject to the said restrictions which are to "run with and bind the land and each and all of the above mentioned lots * * *." The restrictions, further, expressly are to be "kept and performed by and inure to the benefit of and be enforceable by all and every person * * * at any time owning or occupying said land * * *" or any part of it. We have no difficulty in concluding that the Gnaus intended to and did bind themselves, and every part of the land in Loch Knoll Manor owned by them at any time, fully to the restrictions.

The chancellor found that there was a common scheme of development, basing his conclusion on the language of the deeds and the evidence before him of Mr. Gnau and of those who had bought lots. We think the record clearly permitted the finding the chancellor made, and this would be an additional reason why the land retained by the grantors was subject to the restrictions and why prior grantees could call

upon equity to compel performance of their promises by the grantors. *Turner v. Brocato, supra; Adams v. Parater,* 206 Md. 224.

On the appellants' contention that the restrictions have been waived or abandoned by each of the appellees, the chancellor found that there had been no acquiescence on the part of either the Gnaus or the respective lot owners in the abandonment of the restrictions. He said: "There is evidence that the houses are not precisely centered on the plaintiffs' properties, and there is a slight encroachment over the original setback lines, this deviation being due in the main to the fact that the State has widened Loch Raven Boulevard. Although all first floor exterior surfaces were required to be of brick or stone, a small but attractive rear porch on the home of the plaintiff, Kinlein, has a white clapboard facing." He went on to hold that these deviations were trivial and did not amount to evidence of waiver or abandonment of the restrictions, pointing out that Gnau had told one of the appellees that there had been a violation in the building of the clapboard porch but that he, Gnau, would insist upon the restrictions and would require a fence that was proposed to be built to be built of stone, as the restrictions required. We think there is no merit in the contention as to waiver or abandonment. *Kirkley v. Seipelt;* and *Schlicht v. Wengert,* both *supra.*

In disposing of the final contention of the appellants—that the neighborhood has changed so substantially as to require a finding that the restrictions are no longer worthwhile or significant—the chancellor found, we think correctly, that the evidence did not support the claim. When the restrictions were imposed in 1947, the four corners of Loch Raven Boulevard and Taylor Avenue were commercial. The rest of the area was almost entirely residential. There has been an intensification of the commercial uses at the intersection since 1947, but the testimony and the photographs in evidence show that the area immediately surrounding Loch Knoll Manor remains essentially residential in character and fully support the chancellor's finding that the change in the neighborhood has been neither complete nor radical. *Texas Com-*

*pany v. Harker,* 212 Md. 188. None of the appellants' claims offer any basis for slipping the restrictions from their land or for striking them down altogether.

*Decree affirmed, with costs.*