521 A.2d 734

MERCANTILE–SAFE DEPOSIT AND TRUST
COMPANY et al.

v.

MAYOR AND CITY COUNCIL OF BALTIMORE.

**No. 121 Sept. Term, 1986.**

Court of Appeals of Maryland.

March 3, 1987.

K. Donald Proctor (Virginia W. Barnhart and Miles & Stockbridge, on the brief) Towson, for appellants.

Sandra R. Gutman, Asst. City Sol. and Richard K. Jacobsen, Chief Sol. (Benjamin L. Brown, City Sol., on the brief) Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, COUCH, McAULIFFE and ADKINS, JJ., and

CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

ADKINS, Judge.

Leases of two improved properties in Baltimore City included agreements requiring their common lessee to re-store the demised premises to certain conditions prior to the termination of the leases. Before the leases had terminated, Baltimore City acquired both properties by "quick-take" condemnation. The Circuit Court for Baltimore City concluded that the lessee's restoration obligations were not compensable property rights and excluded evidence of the substantial increase in value of the properties attributable to the agreements. Because we shall hold that the restoration obligations were covenants running with the land, and property interests for which compensation must be paid, we shall reverse.

## I.  *Background*

For simplicity's sake, we shall treat appellant, Mercantile-Safe Deposit & Trust Company (Mercantile), as the property owner/lessor.[1] The Mayor and City Council of Baltimore (the City) is appellee. The properties here involved are 202 North Howard Street and 308 West Lexington Street. At one time, these properties existed as separate and distinct parcels, each containing its own improvements. Years ago, however, these properties, along with other lots, were leased to Hochschild, Kohn & Co., Incorporated (Lessee),[2] which combined all of them into a single, large department store complex, removing most, if not all, of the features that had once distinguished the separate properties.

---

1.  Mercantile had certain interests in the properties as trustee. There were other owners as well, and they also are appellants here. Mercantile, it seems, managed the properties for all of the owners.

2.  By the time the City decided to acquire the properties, the lessee was Hochschild's successor in interest, Supermarkets General Corporation. We include that corporation within the designation "Lessee."

On 20 April 1962 Mercantile and Lessee entered into extensions of two earlier leases covering 202 North Howard Street and 308 West Lexington Street. By the terms of the 1962 documents, each of the earlier leases was extended for an additional period of 16 years, beginning on 1 September 1965 and ending on 31 August 1981. Each new lease contained the following provision:

"7. AND IT IS FURTHER COVENANTED AND AGREED by and between [Mercantile] and Lessee for themselves and their respective heirs, personal representatives, successors and assigns, as follows:

\* \* \* \*

"(f) That not less than ninety (90) days prior to the termination of this lease, or any extension thereof, the Lessee shall, at its own expense, ... commence so to restore the premises demised hereunder as to render them capable of occupancy, lease, or sale for mercantile purposes, as a separate and distinct structure by erecting or restoring walls, ... (such walls to be erected and constructed on the boundaries of said lot established by the record title thereof); interior supports, entrance doors, and show windows; floors, stairways, and fire escapes; and plumbing, heating and electrical installations.... In the event that such restoration is not completed within said period of ninety (90) days, whether such delay is or is not attributable to the fault of the Lessee, the Lessee agrees to make appropriate payment to [Mercantile], such payment to be calculated in the same manner as the rent and additional rent reserved hereunder, and to cover the period from the termination of this lease, to the time when such restoration has been completed....

"Lessee, in making restoration, shall have the right and option of either converting and restoring the existing structure, or constructing a new structure which shall be a building limited in height to three stories...."

In November 1980, some nine months before the expiration of the terms of the extended leases, the City advised

Mercantile of its intention to acquire the properties for urban renewal purposes. This advice indicated that "it will be necessary to have all properties acquired and vacated by May 1, 1981." A similar notice was sent to Lessee.

May 1981 came and went. The City took no action to condemn prior to that date, and Lessee continued to hold the premises. On 12 June Mercantile wrote Lessee, reminding it of its obligations under paragraph 7(f) of the leases. Five days after that, the City filed "quick-take" condemnation suits as to each property. The two actions were consolidated.

In the course of preparing for trial, appraisers for both Mercantile and the City agreed that if the restoration obligations of Lessee were compensable rights, they added materially to the value of the property. There was disagreement, however, as to whether the obligations constituted compensable rights. This issue was presented to the trial court by a motion in limine on behalf of Mercantile and by a motion for separate trial on an issue of law (Md. Rule 2–502) by the City. The court (Hammerman, C.J.) denied Mercantile's motion and granted the City's. The effect of this was to exclude from evidence valuation testimony relying on the restoration agreements. Mercantile thereupon stipulated that the value of 202 North Howard Street was $127,300 without consideration of the restoration obligations. As to 308 West Lexington Street, the City's appraiser testified that its value (ignoring the obligations) was $135,000. Inquisitions were duly entered, and Mercantile appealed to the Court of Special Appeals. We granted certiorari while the appeals were still pending in that court.

## II. *Covenants running with the land*

The principal bone of contention here is whether the restoration obligations were covenants running with the land or, as the City contends and as Chief Judge Hammerman held, merely personal to Lessee. The parties view determination of the appropriate category as pivotal to the question of compensability. We agree, and, before address-

ing the compensation dimension of this dispute, proceed directly to that contention.

The Court of Special Appeals has recently had occasion to consider the nature of covenants running with the land. In *Gallagher v. Bell*, 69 Md.App. 199, 516 A.2d 1028 (1986), *cert. denied*, 308 Md. 382, 519 A.2d 1283 (1987), Judge Wilner, writing for that court, traced the development of the concept from *Spencer's Case*, 5 Co. Rep. 16a, 77 Eng. Rep. 72 (QB 1583) to the present day. Quoting 5 R. Powell, *The Law of Real Property* § 673(1), pp. 60–37, 60–38 (1986), he distilled the elements of such a covenant as " 'that: (1) the covenant "touch and concern" the land; (2) the original covenanting parties intend the covenant to run; and (3) there be some privity of estate' " and that (4) the covenant be in writing. 69 Md.App. at 208, 516 A.2d at 1033. In the case before us, the covenant, if it be one, is certainly in writing. Privity of estate clearly exists; indeed, the City makes no argument to the contrary. The disagreement is over the existence of Powell's first two elements. Maryland cases have alluded to both of those as being essential to a covenant running with the land. *See, e.g., Md. & Pa. R. Co. v. Silver*, 110 Md. 510, 73 A. 297 (1909); *Whalen v. Balto. & Ohio R. Co.*, 108 Md. 11, 69 A. 390 (1908); *Com. Bldg. Assn. v. Robinson*, 90 Md. 615, 45 A. 449 (1900); *Glenn v. Canby*, 24 Md. 127 (1866); and *Gallagher* (the "touch and concern" element). *See also e.g., Kirkley v. Seipelt*, 212 Md. 127, 128 A.2d 430 (1957); *Turner v. Brocato*, 206 Md. 336, 111 A.2d 855 (1955); *Union Trust Co. v. Rosenburg*, 171 Md. 409, 189 A. 421 (1937); and *Gallagher* (the "intent" element).

### A. *Touch and concern*

■ As we have already noted, this Court has explained that "a covenant to run with the land must extend to the land, so that the thing required to be done will affect the quality, value, or mode of enjoying the estate conveyed, and thus constitute a condition annexed, or appurtenant to it. . . ." *Glenn*, 24 Md. at 130. Applying this definition, Maryland cases have determined a variety of agreements to

be covenants running with the land: an undertaking, in a mortgage, to pay ground rent and taxes, *Barron v. White-side*, 89 Md. 448, 43 A. 825 (1899); an agreement to keep mortgaged property insured and to make repairs or rebuild, *Thomas v. Vonkapff*, 6 G. & J. 372 (1834); a contract not to construct improvements without prior approval of external design and location, *Kirkley, supra;* and an agreement to share pro-rata the cost of installation of certain streets and utilities, *Gallagher, supra.*

Whether a covenant touches and concerns the land may be considered in terms of the burdens or benefits it imposes. Thus, the test is met if the performance of the covenant will "tend necessarily to enhance [the] value [of the land] ...," *Whalen*, 108 Md. at 20, 69 A. at 393; *see also Silver*, 110 Md. at 516, 73 A. at 300. Powell espouses the more comprehensive formulation adopted by Dean Bigelow:

> "If the covenantor's legal interest in land is rendered less valuable by the covenant's performance, then the burden of the covenant satisfies the requirement that the covenant touch and concern the land. If, on the other hand, the covenantee's legal interest in land is rendered more valuable by the covenant's performance, then the benefit of the covenant satisfies the requirement that the covenant touch and concern land."

*Powell, supra,* § 673[2], at 60–41. Another author explains:

> "Ordinarily, ... a covenant is regarded as touching and concerning the land if it is of value to the covenantee by reason of his occupation of the land or by reason of an easement which he has in the land, or if it is a burden on the covenantor by reason of his occupation of the land."

3 H. Tiffany, *The Law of Real Property,* § 854, p. 455 (3d ed. 1939). *See also Restatement of Property* § 537 (1944).

It will be noted that the "benefit" and "burden" tests are stated in the alternative; if either is met, the covenant may be one running with the land. This analysis may be a complex one when the undertaking is contained in a fee

simple conveyance so that the two different tracts of land are involved. It is less difficult where, as here (and as in *Spencer's Case*), a lease is involved, and consequently, only a single tract with two different estates in it. *See* II *American Law of Property, supra,* § 9.13.

■ Turning to the Powell/Bigelow formulation, it appears that both aspects of the "touch and concern" test are present here. The requirement of performance of the restoration agreements certainly rendered the covenantor's (Lessee's) interest in the land less valuable; that interest was encumbered by an obligation to restore the two properties to something akin to their original conditions, a substantial burden. As to the covenantee (Mercantile), that obligation surely rendered its interest in the land more valuable. The excluded testimony of the appraisers so concluded, and it seems plain enough that Mercantile's contractual right to get the properties back in restored form, instead of as an undifferentiated part of a vacated department store, enhanced the value of the properties.

The City nevertheless argues that these covenants could not run with the land because they dealt with something not in *esse*—future restoration of the properties. This contention is based on *Spencer's Case.* The agreement there was to build a brick wall. As our predecessors read that opinion in *Lynn v. Mount Savage Iron Co.,* 34 Md. 603, 634–35 (1871), *Spencer's Case* held:

> "1st. That when the covenant extends to a thing in *esse,* parcel of the demise, the thing to be done by force of the covenant is in a manner annexed and appurtenant to the thing demised, and shall run with the land, and shall bind the assignee, although he be not bound by *express words;* as if the lessee covenant to repair the houses, this is parcel of the contract, and extends to the supporting of the thing demised; but, because the covenant in that case was in respect of a thing which was not in *esse* at the time of the demise made, but to be newly built after, and therefore bound only the covenantor, his executors or

administrators, *and not the assignee,* the covenant did not, by the law, annex. 2nd. But if the lessee had covenanted for himself *and his assigns,* that they would make a new wall upon some part of the thing demised, that forasmuch as it is to be done upon the land demised, that it should bind the assignee; for although the covenant doth extend to a thing to be newly made, yet it is to be made upon the thing demised, and the assignee is to take the benefit of it, and therefore shall bind the assignee by *express words* [emphasis in original]."

In *Lynn,* the covenant to erect wharves and other improvements clearly referred to things not in *esse* and since it did not purport to bind the covenantor's assigns, the Court held that it did not run with the land. On similar facts the same result was reached in *Dawson v. Western Md. R. Co.,* 107 Md. 70, 68 A. 301 (1907).

On the other hand, in *Whalen,* 108 Md. at 20, 69 A. at 393, an agreement to construct and maintain a railroad turnout and siding at a certain location was held to be a covenant running with the land. Although the facilities were not in *esse* when the covenant was made, the Court, relying on *Spencer's Case,* found decisive the fact that the agreement expressly bound the covenantor, its successors and assigns. The rule was recognized again in *Silver, supra,* although there the covenant did not run with the land because it did not refer to anything in *esse and* there were "no words of limitation to the heirs and assigns to the grantor." 110 Md. at 516, 73 A. at 300. And in *Linthicum v. W.B. & A. Rd. Co.,* 124 Md. 263, 92 A. 917 (1914), the Court suggested that an agreement relating to something to be done in the future was not technically a covenant running with the land, but would be given that effect because of express words binding successors and assigns.

■ The Maryland cases, therefore, give critical effect to the presence or absence of language binding successors and assigns. If these words are present, as they are here, the covenant is one running with the land or the functional

equivalent thereof. That is, when the performance of the covenant touches and concerns the land within the meaning of the "benefit or burden" standard, it is deemed one running with the land, even when it deals with something not in *esse,* when the agreement expressly binds successors and assigns. Indeed, this reasoning is entirely consistent with the majority American view that makes no distinction between affirmative and restrictive covenants for the purpose of determining whether a covenant runs with the land. It is well established that an affirmative covenant, which imposes a burden on the covenantor for the performance of some future act, may be a covenant running with the land and an interest in real property. *See Barron v. Whiteside,* 89 Md. 448, 43 A. 825 (1899); *Thomas v. Vonkapff,* 6 G & J 372 (1834); *Gallagher v. Bell, supra. See also Adaman Mutual Water Co. v. United States,* 278 F.2d 842 (9th Cir.1960); *Burton-Jones Development, Inc. v. Flake,* 368 Mich. 122, 117 N.W.2d 110 (1962); *Vinson v. Meridian Masonic Temple Building Assoc.,* 475 So.2d 807 (Miss. 1985); *Mendrop v. Harrell,* 233 Miss. 679, 103 So.2d 418 (1958); *Horst v. Housing Auth. of County of Scotts Bluff,* 184 Neb. 215, 166 N.W.2d 119 (1969); *Old Dominion Iron and Steel Co. v. Virginia Electric & Power,* 215 Va. 658, 212 S.E.2d 715 (1975); Note, *A New Phase in the Development of Affirmative Equitable Servitudes,* 51 Harv.L.Rev. 320 (1937); II *American Law of Property,* § 9.16 (1952).

In the present case, the restoration agreements are affirmative covenants, for they impose on the covenantor the future obligation to restore the altered premises. That the covenants are to be performed in the future cannot, alone, defeat their characterization as covenants running with the land. The restoration agreements meet the "touch and concern" test; they are to be performed on the very land demised, they relate to the physical condition of that land; they burden the covenantor and benefit the covenantee, and they bind successors and assigns.

Thus, they are covenants running with the land if the other elements of such a covenant exist. As we have seen,

two of those other elements, privity and the existence of a written agreement, are not at issue here. The remaining element, the intent of the parties, is, however, a disputed issue, the resolution of which depends heavily on the "successors and assigns" language. We now turn to the question of intent.

### B. *Intent*

■ A covenant that touches and concerns the land may be prevented from running with the land if the parties indicate an intent that it not do so. 3 Tiffany, *supra,* § 854, p. 461. *See Gnau v. Kinlein,* 217 Md. 43, 48, 141 A.2d 492, 495 (1958). "Unlike the 'touch and concern' test, which looks objectively at the nature and quality of the covenant and seeks to measure the relationship between its performance and someone's enjoyment of the land, the intention requirement 'focuses on the subjective state of mind of the original covenanting parties,'" *Gallagher,* 69 Md.App. at 212, 516 A.2d at 1035 (quoting Powell, *supra,* § 673[2], at 60–49). That intent "may be ascertained from the language of the conveyances alone or from that language together with other evidence of intent." *Gnau,* 217 Md. at 48, 141 A.2d at 495. In the cases before us, there is no suggestion that any evidence of intent exists, other than that manifested by the leases. While subjective intent ordinarily is a factual question inappropriate for decision on motion, *Berkey v. Delia,* 287 Md. 302, 413 A.2d 170 (1980), in the case before us, there are no disputed facts on the question of intent, and we think the reasonable inferences from those facts compel but one conclusion. Therefore, the intent question can be decided as a matter of law. *See e.g., Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138–139, 265 A.2d 256, 258–259 (1970); *Tavel v. Bechtel Corporation,* 242 Md. 299, 307, 219 A.2d 43, 45 (1963); *Gallagher,* 69 Md.App. at 212–213, 516 A.2d at 1035.

Did Mercantile and Lessee intend these covenants to run with the land? The nature of the covenant strongly indicates they did. The agreements to restore in these long-term leases would be of little value to Mercantile if they

were only personal to Hochschild's, the original lessee, and not binding on a successor in interest such as Supermarkets General. Moreover, the leases expressly bind the successors and assigns of the parties. That in itself is "strong evidence of the devolutive intent." *Powell, supra,* § 673[2], at 60–51. *Spencer's Case* supports this view, as do such Maryland decisions as *Linthicum, Silver, Whalen, Dawson,* and *Lynn.*

It is true that in *Union Trust Co. v. Rosenburg,* 171 Md. 409, 415–16, 189 A. 421, 424 (1937) we quoted such secondary authority as 7 *R.C.L.* 1099, 1100–1101, and 15 C.J. "Covenants" 1244 to the effect that the use of the technical word "assigns" was not controlling as to the existence of a covenant running with the land. But there the problem was the absence of the word, and we construed an agreement in a mortgage to be one running with the land despite that lack.

The facts of *Rosenburg* are instructive. There, a mortgage provided that " 'the mortgagors, their heirs, successors or assigns, shall have possession of the property, upon paying in the meantime all taxes and assessments,' and other specified charges, which taxes and assessments and other specified charges 'the said mortgagors covenant to pay when legally due.' " 171 Md. at 416, 189 A. at 425 [emphasis deleted]. The mortgagors' agreement to pay the charges was, in terms, on behalf of the mortgagors only; there were no express words binding their successors and assigns to do that. Nevertheless, the Court held that this agreement was a covenant running with the land. It reasoned:

> "[I]t would be an illogical conclusion to hold that it was the intention of the original mortgagors to provide that their heirs, successors, or assigns should come into possession of the property and enjoy the benefit of the emoluments accruing therefrom, without at the same time incurring the obligations incident to its maintenance; or, stated differently, that it was the intention of the mortgagors to assume the whole obligation of the pay-

ment of taxes and charges, regardless of the passage of title in the mortgaged property to others. It might be added that it would be likewise illogical to conclude a similar intention on the part of the mortgagees, for the obvious reason that the covenant to pay, in itself, is dependent upon the financial responsibility of the covenantor, and that the passing of his title to the successor would correspondingly weaken and in many cases destroy the security of the covenantee, if the covenant did not follow the property."

*Id.* at 416–17, 189 A. at 425.

*Rosenburg* stands for the proposition that intent to make a covenant run with the land may exist despite the failure to include in it a reference to the covenantor's assigns. It does not hold that the use of the word "assigns" is not strong and important evidence of such an intent. On the contrary, use of that word is, under the Maryland cases, virtually conclusive evidence of intent that the covenant run with the land, absent specific language to the contrary.

Moreover, the reasoning of *Rosenburg* is applicable to the covenants before us. It would be illogical to conclude that Lessee, who had the benefit of including the leased properties within its department store complex, did not intend to incur, for itself and its successors, the obligations of the covenants. And it would be equally illogical to conclude that Mercantile, which had leased two improved lots, did not intend the obligation to restore to follow the property, so that restoration would be required at the end of the lease, regardless of who was then the tenant.

Looking to the documents before us, as the *Rosenburg* court did, and finding no evidence of contrary intent in the record, we hold that the parties intended the restoration agreements to run with the land. Since they meet both the "touch and concern" and the "intent" factors, we hold that these agreements are covenants running with the land.

That conclusion, however, does not end our inquiry, for Article III, § 40, of the Maryland Constitution provides:

"The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation...."[3] We must, therefore, determine whether the restoration agreements, being covenants running with the land, are also compensable property in a constitutional sense.

█ It has been broadly stated that "[t]he constitutional provision is addressed to every sort of interest the citizen may possess." *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945) (quoted in *Bureau of Mines v. George's Creek*, 272 Md. 143, 157, 321 A.2d 748, 756 (1974)). Perhaps the principle may be more narrowly stated as: property denotes "the group of rights inhering in the citizen's relation to the physical thing...." *General Motors*, 323 U.S. at 378, 65 S.Ct. 359. Taken in that way, "property" clearly encompasses more than a tangible thing; it "extends to easements and other incorporeal hereditaments, which, though without tangible or physical existence, may become the subject of private ownership." *De Lauder v. Baltimore County*, 94 Md. 1, 6, 50 A. 427, 428 (1901).

Thus, *De Lauder* held that an easement for ingress and egress is compensable property. So is a scenic easement, *Hardesty v. State Roads Com'n*, 276 Md. 25, 343 A.2d 884 (1975), and a leasehold interest, *Veirs v. State Roads Comm*, 217 Md. 545, 143 A.2d 613 (1958). More to the point, the Supreme Court of California has reasoned that "[t]o establish a substantive distinction by merely labeling one [an easement for ingress and egress] a property inter-

---

**3.** The fifth amendment to the United States Constitution similarly prohibits the taking of "private property for public use, without just compensation." The fifth amendment protection is applicable to the states through the fourteenth amendment, *Chicago, Burlington & Quincy R'd v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897); *King v. State Roads Com'n*, 298 Md. 80, 83, 467 A.2d 1032, 1033–1034 (1983), so Supreme Court cases interpreting the federal just compensation clause "are therefore practically direct authority for ... interpretation of ... Art. III, § 40...." *King*, 298 Md. at 84, 467 A.2d at 1034.

est for which compensation must be made and the other [a restrictive covenant] a mere contractual right which may be appropriated by a condemnor without any compensation is inequitable and rationally indefensible." *Southern Cal. Edison Co. v. Bourgerie,* 9 Cal. 3d 169, 173, 107 Cal.Rptr. 76, 507 P.2d 964, 966–67 (1973).

Indeed, the majority rule in the United States is that a restrictive covenant running with the land is a compensable property right for condemnation purposes. Nichols, *The Law of Eminent Domain* § 6.16 (3d ed. 1985). *And see* II *American Law of Property* § 9.40 (1952), and *Restatement of Property* § 566 (1944). Both the majority and minority views are reviewed in *Washington Sub. San. Com'n v. Frankel,* 57 Md.App. 419, 470 A.2d 813 (1984), *vacated on other grounds,* 302 Md. 301, 487 A.2d 651 (1985).

The view that covenants running with the land are indeed property interests is entirely consistent with Maryland decisions. Over one hundred twenty years ago our predecessors explained that a covenant running with the land is one that "must extend to the land, so that the thing required to be done will affect the quality, value, or mode of enjoying the estate conveyed, and thus constitute a condition annexed, or appurtenant to it...." *Glenn v. Canby,* 24 Md. 127, 130 (1866). *And see Pollack v. Bart,* 202 Md. 172, 176, 95 A.2d 864, 866 (1953) ("An equitable restriction on land has been held to be a property right in the person in favor of whose estate it runs or to which it is appurtenant").

We have no difficulty, therefore, in concluding that a covenant running with the land ordinarily is a compensable property interest in the condemnation context, at least to the extent it adds measurable value to the land to which it is attached. Indeed, the City virtually concedes as much. Both in the trial court and before us, the City said it had "no quarrel" with the holding in *Frankel.* E. 124; City's Brief at 12. That holding was that a restrictive covenant was a compensable property interest. 57 Md.App. at 434, 470 A.2d at 820. The City's chief argument is that the

agreements before us are not compensable, because they are merely personal to the parties, and not covenants running with the land. That argument, as we have explained, is unpersuasive.[4]

### III. *The City's Remaining Contentions*

The City advances two other reasons to support its view that Mercantile should not be compensated for the enhanced value of the properties produced by the covenants. The first is that it did not condemn the leasehold interest; hence it did not acquire the covenants. Those covenants were mere contractual expectations, the loss of which constituted non-compensable consequential damages. The second is that because the restoration covenants were in default, Mercantile cannot recover for their loss.

### A. *No taking*

■ The City posits that "[i]t is settled law that in the absence of specific statutory mandate, compensation under the Fifth Amendment may be recovered only for property taken and not for incidental or consequential losses, the rationale being that the sovereign need only pay for what it actually takes rather than for all that the owner has lost." *R.J. Widen Co. v. United States*, 357 F.2d 988, 994 (Ct.Cl. 1966). Since, it argues, it did not condemn the leasehold interests, which in any event were about to expire, but only Mercantile's fee simple interest, it did not take the restoration covenants. As a consequence, the argument continues, any loss to Mercantile by virtue of the non-performability of the covenants was merely incidental to the taking of the land, and not compensable.

---

**4.** That, in the present case, the restoration agreements are affirmative covenants running with the land, imposing on the covenantor the burden to restore the altered premises, is of no consequence to our conclusion. The restoration agreements represent property in a constitutional sense for which there must be just compensation. *See Adaman Mutual Water Co. v. United States*, 278 F.2d 842 (9th Cir. 1960); *Horst v. Housing Auth. of County of Scotts Bluff*, 184 Neb. 215, 166 N.W.2d 119 (1969).

We need not discuss the circumstances under which what may be termed "consequential" damages are recoverable in a condemnation case, *Brannon v. State Roads Commission*, 305 Md. 793, 800–801, 506 A.2d 634, 638 (1986), and when they are not. *De Lauder*, 94 Md. at 9–10, 50 A. at 430; *see also Ridings v. State Roads Commission*, 249 Md. 395, 240 A.2d 236 (1968); *M. & C.C. v. Balto. Gas Co.*, 232 Md. 123, 192 A.2d 87 (1963); *Friendship Cemetery v. Baltimore*, 197 Md. 610, 81 A.2d 57 (1951). Nor need we engage in semantical debate over the application of the notion that "the sovereign need only pay for what it takes rather than for all that the owner has lost," *Widen, supra*, at 994, versus the concept that "the question is what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce v. Boston*, 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725 (1910), quoted with approval in *Sholom v. State Roads Commission*, 246 Md. 688, 702, 229 A.2d 576, 583 (1967). This is because the non-taking or consequential damages cases relied on by the City are simply not on point.

In *Widen* the taking of real estate and water rights caused a tannery to lose future profits and business expectations. Those profits and expectations had not, of course, been appropriated by the government and no compensation for them was allowed. *Omnia Commercial Co. v. United States*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923), also concerned contracts that could not be performed when the government requisitioned a steel company's yearly production. The government did not appropriate the contracts; it rendered them impossible of performance, and no compensation was allowed. Moreover, *Omnia* was not a condemnation case, but one involving exercise of the police power. There are differences in the approach to compensability in each situation. *Penn Central Trans. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Md.-Natl. Cap. P & P Comm'n v. Chadwick*, 286 Md. 1, 8–12, 405 A.2d 241, 245–246 (1979); *QC Corp. v. Maryland*

*Port Admin.*, 68 Md.App. 181, 203–206, 510 A.2d 1101, 1112–1114, *cert. granted*, 307 Md. 753, 517 A.2d 102 (1986).

*Long Island Water Supply Co. v. Brooklyn*, 166 U.S. 685, 17 S.Ct. 718, 41 L.Ed. 1165 (1897), concerned a contract which had in fact been taken and for which compensation was paid. The Court held that the federal constitutional prohibition against impairment of the obligations of a contract did not prevent the condemnation of a contract. 166 U.S. at 690, 17 S.Ct. at 720. Finally, in *Klein v. United States*, 375 F.2d 825 (Ct.Cl.1967), *cert. denied*, 389 U.S. 1037, 88 S.Ct. 770, 19 L.Ed.2d 824 (1968), contracts for the stockpiling and removal of gravel were held to be personal property and not taken, but simply frustrated when the government condemned the land on which the gravel was located. No compensation for the contracts was allowed. 375 F.2d at 829.

*Omnia* points out that "[i]f ... a contract or other property is *taken* for public use, the Government is liable...." 261 U.S. at 510, 43 S.Ct. at 438 [emphasis in original]. *Widen* contains similar language. 357 F.2d at 993. That explains the distinction between the City's authorities and this case. What the City took here was Mercantile's land. To that land were attached covenants running with it—"condition[s] annexed or appurtenant to it," to use the language of *Glenn*, 24 Md. at 130. These covenants were rights in the real property itself, and when the land was taken, so were the covenants. When the fee is taken, "that which is taken ... is the group of rights which the ... owner exercises in his dominion of the physical thing...." *General Motors Corp.*, 323 U.S. at 379–80, 65 S.Ct. at 360.

The restoration covenants, thus, were not mere future business expectations. They were interests in the property itself. When the City condemned the property, and with it the covenants, Mercantile became entitled to compensation for any value they added to the land.

## B.  *Default*

■ As we noted early on, the leases before us were to expire on 31 August 1981.  The restoration covenants required Lessee to commence restoration at least 90 days prior to termination.  On 12 June, within that period, Mercantile reminded Lessee of its restoration obligation.  But when the City filed its condemnation proceedings on 17 June, nothing had been done in that regard.  The City succeeded in convincing the trial judge that because of this the covenants were in "default" and thus not compensable.

Just how this "default" should produce that result is somewhat mysterious, since the City cites no authority to support its conclusion to this effect.  We are left to wonder whether it relies on some notion of waiver or estoppel, or whether it thinks that the Lessee's possible breach of the covenants (possibly acquiesced in by Mercantile) would have precluded Mercantile from enforcing them, had the condemnation not intervened.  The judge below made no factual findings on any of those matters, nor does the record contain evidence that would have permitted him to do so.

It may be, as the trial judge hypothesized, that a potential buyer of the land would have been concerned about the value of the covenants because of this "default."  The trial judge felt "it's highly speculative and was highly speculative on June 17 just what this contractual right really amounted to and how much it could have been worth...."  But all of that goes to the question of valuation.  And the factors present here would not seem to be more "speculative" than the probability that property might be used for subdivision at a reasonable time in the future, or that imminent zoning changes might affect the value of land.  Fact-finders were permitted to consider such aspects of value in *Lustine v. State Roads Comm.*, 217 Md. 274, 142 A.2d 566 (1958), and *State Roads Comm v. Warriner*, 211 Md. 480, 128 A.2d 248 (1957).

We hold that the evidence was insufficient as a matter of law to support the trial judge's conclusion that the cove-

nants were in default, and the resulting exclusion of valuation evidence on the basis of the asserted default was error.

#### IV. *Summary*

The restoration covenants are covenants running with the land. As such, they are property interests in the land itself. When the City condemned the land it took the property interests represented by the covenants. To the extent the covenants enhanced the value of the land, they are compensable. The trial court erred when it excluded evidence of that enhanced value.

JUDGMENTS REVERSED. CASES REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.